In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1673

ST. JOAN ANTIDA HIGH SCHOOL INC.,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE PUBLIC SCHOOL DISTRICT,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:17-cv-00413-JPS — **J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 18, 2018 — DECIDED MARCH 25, 2019

Before SYKES, BARRETT, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* There have been several constitutional challenges to school busing in Wisconsin over the years. *See, e.g., St. Augustine Sch. v. Evers*, 906 F.3d 591 (7th Cir. 2018); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677 (7th Cir. 2005). This is another. Our focus here is on the Milwaukee Public School District ("MPS"), private schools, and the Equal Protection Clause.

MPS offers free transportation to public-school students who attend certain schools outside of their neighborhoods. All other students—including private-school students—are only eligible if they live farther than one mile from the nearest public-transportation stop. MPS also requires private schools to submit a roster of students who need transportation by July 1; it has no such requirement for its public schools. St. Joan Antida High School, a private school, filed this lawsuit, claiming that these restrictions violate the Equal Protection Clause. This is especially so, St. Joan submits, because state law requires MPS to transport students with "reasonable uniformity," whether they attend public or private schools.

The district court granted summary judgment to MPS, and St. Joan appeals. We affirm in part and reverse and remand in part. Rational bases exist for the differences in busing eligibility, and so we affirm on that ground. But more work needs to be done to resolve St. Joan's challenge to the July 1 deadline, and so we reverse and remand on that ground.

## I. Background

Busing parochial schoolchildren with public funding used to be considered unconstitutional in Wisconsin. *See State ex rel. Reynolds v. Nusbaum*, 115 N.W.2d 761, 770 (Wis. 1962). In 1967, however, the state held a referendum, which asked voters whether Wisconsin's constitution should be amended to permit state-funded transportation of private and parochial students. The voters decided it should, and the Wisconsin constitution was amended. Wis. Const. art. I, § 23; *see also Cartwright v. Sharpe*, 162 N.W.2d 5, 8 (1968).

After the amendment, Wisconsin passed enabling legislation that requires school districts to provide transportation for

both public- and private-school students. *See* Wis. Stat. § 121.54. There are exceptions, though. The most notable (for our purposes) is the exception for a school district operating within a metropolitan area. Under § 121.54's "city option," a school district in a city need not—but can decide to—provide transportation if other public transportation is generally available to schoolchildren. *Id.* § 121.54(1). Should a school district exercise the city option, there must "be *reasonable uniformity* in the transportation furnished to pupils, whether they attend public or private schools." *Id.* § 121.54(1)(b) (emphasis added).

MPS has exercised the city option, and it therefore offers transportation to Milwaukee-area schools. There are two primary types of public schools in the MPS system: (1) citywide schools, which offer special courses, like language-immersion classes or International Baccalaureate® programs, and draw from the entire Milwaukee area; and (2) attendance-area schools, which generally do not have such programs and draw only from a particular neighborhood. MPS, at times, designates certain students to attendance-area schools outside of their neighborhoods—making the school a "nonattendance-area school" (as we will call it, for ease of reference). The Milwaukee area, of course, also has private schools, like St. Joan. MPS explains that, under state rules, St. Joan technically has an attendance area; but unlike public attendance-area schools, St. Joan's allotted area is the entire city of Milwaukee.

To ensure transportation to these schools, MPS devised Policy 4.04. This lawsuit challenges two parts of that policy.

The first challenge concerns how MPS decides which students are eligible for busing. Under § 2 of Policy 4.04, high

schoolers may receive free transportation only if they live two or more miles from their school and "more than one mile walking distance from public transportation" (a restriction we will call the "one-mile rule").[1] But § 5 provides more generous transportation benefits for high schoolers who attend either citywide or nonattendance-area schools. That section, which is titled "Racial Balance, Modernization, Overload, and Lack of Facility," makes any student assigned to a school farther than two miles from her home eligible for free transportation—regardless of the student's proximity to public transportation. In fewer words, citywide and nonattendance-area students are not subject to the one-mile rule under § 5.

The second challenge is to MPS's roster-notification deadline. Under § 121.54(2)(b), private schools must submit the names, grade levels, and residences of all students who are eligible to receive busing to MPS by May 15. The provision allows a school board to "extend the notification deadline," which MPS has done. Policy 4.04 states that private schools must submit the roster by the third Friday in September. In practice, however, the parties agree that MPS requires the rosters by July 1. According to MPS, the deadline is necessary so that it has sufficient time to arrange for the transportation of eligible private-school students before school starts. There is no like roster-notification deadline for public schools, MPS says, because it has immediate access to the requisite information needed for eligible public-school students.

In 2016, St. Joan applied to MPS for student transportation during the upcoming 2016–2017 school year. On May 14, 2016,

---

[1] Policy 4.04 provides different transportation terms for elementary schools. Those terms are not relevant to this dispute.

St. Joan submitted its original roster, which included the names of sixty-two students relevant to this appeal; on September 29, 2016, it updated the list with six more relevant names. What prompted St. Joan to update its roster is unclear, but MPS refused to bus any of these sixty-eight students. Each of them lived within one mile of public transportation, and the six later-added students were disclosed after the July 1 deadline. St. Joan protested, but eventually covered transportation for the students. Doing so cost a total of $178,640 for the 2016–2017 and 2017–2018 school years.

Looking to recover that loss, St. Joan brought this action, which also seeks injunctive and declaratory relief. St. Joan asserts two claims. The first claim alleges that Policy 4.04's two restrictions—the one-mile rule and the July 1 deadline—violate the Equal Protection Clause of the Fourteenth Amendment. *See* 42 U.S.C. § 1983. The second claim, brought under Wis. Stat. § 121.54, asserts that the restrictions violate Wisconsin's reasonable uniformity requirement.[2] After discovery, the parties cross-moved for summary judgment. The district court granted MPS's motion and denied St. Joan's, reasoning that Policy 4.04's two restrictions had rational bases. 293 F. Supp. 3d 813 (E.D. Wis. 2018). With the constitutional claim

---

[2] St. Joan sued on its own behalf and on behalf of the sixty-eight children's parents, from whom St. Joan received assignments of rights and claims. The exemplar assignment in the record speaks only of a "full and complete assignment of rights and claims under Wis. Stat. §§ 121.54 and 121.55"—it does not address assignment of § 1983 claims. The parties do not address this issue. It does not deter us, though, because the law generally holds that schools have standing to assert the constitutional rights of parents to direct their children's education. *See Runyon v. McCrary*, 427 U.S. 160, 175 n.13 (1976); *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 535–36 (1925); *Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996).

dismissed, the district court declined to exercise supplemental jurisdiction over St. Joan's state-law claim. 28 U.S.C. § 1367(c)(3). St. Joan appeals.

## II. Discussion

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although the Equal Protection Clause does not endow a private right of action, 42 U.S.C. § 1983 does for any constitutional deprivation under color of state law. A municipal entity acting under color of state law—like MPS—may be held liable under § 1983 where it is responsible for the constitutional deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–695 (1978).

On appeal, St. Joan contends that the one-mile rule and the July 1 deadline violate the Equal Protection Clause. We first determine how searching our inquiry must be—under either strict-scrutiny or rational-basis review—before determining whether the restrictions pass constitutional muster. Because this case comes to us after summary judgment, our review is de novo. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). We can affirm on any ground supported by the record. *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004 (7th Cir. 2018).

### A. Standard of Scrutiny

An equal-protection claim merits strict scrutiny, our most exacting inquiry, only if the state-crafted classification disadvantages a suspect class or "impermissibly interferes" with a

fundamental right. *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018). Otherwise rational-basis review governs.[3] *See Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 618 (1985). This case does not involve a suspect class, like race, and neither education nor free transportation to school is a fundamental right. *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–62 (1988); *Plyler v. Doe*, 457 U.S. 202, 223 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–35 (1973); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 690 n.4 (7th Cir. 2005).

St. Joan, however, invokes another fundamental right—the right of parents to direct the education of their children. That right does exist. In *Pierce v. Soc'y of the Sisters*, the Supreme Court struck down a ban on parochial education and held that the "fundamental theory of liberty" protects parents from state attempts to "forc[e]" students into public schooling. 268 U.S. 510, 535 (1925); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000). But the existence of that fundamental right, and its potential implication here, is not enough to trigger strict scrutiny. *See, e.g.*, *Harlan v. Scholz*, 866 F.3d 754, 760 (7th Cir. 2017). A direct and substantial interference is required. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *Bowen v. Gilliard*, 483 U.S. 587, 602–03 (1987); *Zablocki v. Redhail*, 434 U.S. 374, 386–87 & n.12 (1978); *see also Griffin High Sch. v. Illinois High Sch. Ass'n*, 822 F.2d 671 (7th Cir. 1987). St. Joan has shown no such interference with the right recognized in *Pierce*.

---

[3] We set aside intermediate scrutiny, which generally applies to classifications based on quasi-suspect classes, like gender, because it has no potential application to this case. *See, e.g.*, *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014).

St. Joan claims that the withholding of free busing, a state-subsidized benefit, amounts to a prohibited interference with the right to direct a child's education. This stretches *Pierce* too far. As a general rule, a state's "decision not to subsidize the exercise of a fundamental right does not infringe the right" and is therefore "not subject to strict scrutiny." *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549 (1983); *see also, e.g.*, *Sweeney v. Pence*, 767 F.3d 654, 669 (7th Cir. 2014). More to the point, a state that chooses not to assist a private school does not breach the right *Pierce* described. In *Norwood v. Harrison*, the Supreme Court explained:

> It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

413 U.S 455, 462 (1973). In *Maher v. Roe*, the Court added that *Pierce* "casts no shadow over a State's power to favor public education by funding it." 432 U.S. 464, 477 (1977); *see also Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 138 n.12 (5th Cir. 2009); *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19–22 (1st Cir. 2004); Cass R. Sunstein, *Is There an Unconstitutional Conditions Doctrine?*, 26 San Diego L. Rev. 337, 340–42 (1989). *Pierce*, then, does not protect against a state favoring public schools with public dollars, which is—at worst—all MPS has done.

St. Joan's reach for strict scrutiny stretches the record, too. There is no evidence that Policy 4.04 hamstrings the right of parents to direct their children's education. Parents can and

do choose to send their children to Milwaukee private schools, despite Policy 4.04. Parents who cannot rely upon private transportation have other options available. All sixty-eight children live within one mile of public transportation (hence this lawsuit), and St. Joan in fact provided the students with busing. To be sure, the record contains testimonial evidence that some unenumerated number of families declined to send their children to St. Joan because it could not promise free busing. But that Policy 4.04 caused some families to "decide to modify" where they sent their children "does not transform" the policy into an intrusion on parental rights. *Bowen*, 483 U.S. at 601–02 & n.16; *accord Califano v. Jobst*, 434 U.S. 47, 54 (1977). The burden must be direct and substantial, and no evidence shows that.

St. Joan also makes much of the fact that Wisconsin considers free transportation for private-school students to be "important," as evidenced by the 1967 constitutional amendment and § 121.54. This emphasis is misplaced. State-specific policies do not augment fundamental rights. *Accord Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (only rights that are "deeply rooted in this Nation's history and tradition" count as fundamental) (citation omitted). Wisconsin law has implications on whether there are rational bases for Policy 4.04's restrictions (as we discuss below), but not whether strict scrutiny applies.

With strict scrutiny off the table, rational-basis review governs St. Joan's challenges to the one-mile rule and the July 1 deadline. That standard permits a court to invalidate a legislative classification only if there is no rational relationship between the classification and "some legitimate government purpose." *Segovia*, 880 F.3d at 390. "Some" is key—a

classification is generally valid as long as a rational basis is plausible, even if the legislature did not expressly endorse it. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993); *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015). Rational-basis review tolerates overinclusive classifications, underinclusive ones, and other imperfect means-ends fits. *Heller v. Doe*, 509 U.S. 312, 319–320 (1993); *Gregory v. Ashcroft*, 501 U.S. 452, 473 (1991); *Vance v. Bradley*, 440 U.S. 93, 107–09 (1979). The standard also imputes "a strong presumption of validity" on the contested classification. *Beach Commc'ns*, 508 U.S. at 314–15. To overcome that presumption, a challenger must negate "every conceivable basis which might support" the classification. *Id.*

## B.  The One-Mile Rule

Policy 4.04 draws a line. On one side are private schools, like St. Joan, and attendance-area schools, both of which are subject to the one-mile rule; on the other side are citywide and nonattendance-area schools, which are not. St. Joan argues that this line-drawing violates equal protection, at least as applied to it, because the one-mile rule irrationally treats private schools differently.

Equal-protection claims start with the question: treated differently than whom? *See* Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 9.1, 698 (5th ed. 2015). In cases like this, where the challenged regulation provides explicit classifications, the answer should be easy. Driving laws may treat fifteen-year-olds differently than sixteen-year-olds. Liquor laws may treat saloons differently than grocery stores. And so on. The parties, however, muddle the answer here. MPS submits that St. Joan is technically an attendance-area school, because it has an allotted attendance

area under state regulations. Thus, MPS contends, St. Joan is treated differently only when compared to dissimilar schools; but it is treated the *same* as its relevant comparator—attendance-area schools. St. Joan vehemently disagrees, arguing that it must be compared to citywide schools. St. Joan has an attendance area, the school concedes, but that attendance area is the entire city—just like citywide schools.

The debate is unnecessary. Arguments over whether there is an apt "similarly situated" comparator are suited for class-of-one equal-protection cases, in which the individual claimant must show that she was treated differently (and irrationally so) than someone else. *See, e.g.*, *Harvey v. Town of Merrillville*, 649 F.3d 526, 532 (7th Cir. 2011). But where, as here, "the classification appears in the text of" the challenged regulation, we do not "need to identify a comparator." *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 682 (7th Cir. 2017). The regulation that imposes the burden does the work for us.

Here, Policy 4.04 treats private schools, like St. Joan, differently than citywide schools and nonattendance-area schools—and that requires a rational basis. St. Joan submits that there is no rationale for the different treatment, especially in light of § 121.54's reasonable uniformity requirement. MPS responds with two rational bases: (1) furthering its educational mandate by reducing overcapacity and expanding access to special programs; and (2) cost savings. We will address whether those justifications suffice on their own terms, then consider the impact of § 121.54.

MPS, a public-school district, has obvious legitimate interests in reducing overcapacity in crowded attendance-area schools and in expanding special program access to its students. *See Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 363 (5th

Cir. 2015); *Spurlock v. Fox*, 716 F.3d 383, 403 (6th Cir. 2013); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 557 (3d Cir. 2011). Either goal requires the same feat—to put more kids in citywide and nonattendance-area classrooms. To that end, exempting students who attend those schools from the one-mile rule means more kids will get busing to those schools, which in turn encourages and makes easier their attendance to those schools. That is rational.

There is a related reason for limiting the one-mile rule's application. MPS students who attend citywide or nonattendance-area schools are, logically, more likely to have to travel farther from their home to get to school than students who go to attendance-area schools. That beckons a trade-off. In exchange for MPS students traveling farther, MPS makes the travel easier by ensuring free busing for most students.

Faced with these rational bases, St. Joan reframes the issue. It posits, and the district court concluded, that the question is not whether MPS had a rational basis for exempting citywide and nonattendance-area students from the one-mile rule (the district court accepted that it did). The question, St. Joan says, is whether there is a rational basis for *not* extending the same benefit to private-school students. St. Joan sees an upside to the latter formulation, believing it requires MPS to identify something undeserving about private-school students to justify denying them the busing benefits some public-school students receive. But that is not how rational-basis review works.

The standard, like most in constitutional law, is a means-end test. *See* G. Stone et al., CONSTITUTIONAL LAW 453 (7th ed. 2013). We need only identify a legitimate end and ask whether the means—the classification—bears a rational relationship to the end. *E.g.*, *Armour*, 566 U.S. at 680; *Beach Commc'ns*, 508 U.S.

at 315–20. So if, for example, a state is concerned with the success of its small-business sector, and, in response, it passes a regulation offering more generous grant terms to companies with fewer than fifty employees, the regulation is rationally related to the state's legitimate concern. The analysis ends there. *See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 176–79 (1980). On rational-basis review, we do not additionally require the state to persuade us why a company with, say, two-hundred employees would not also benefit from more grant money. *Cf. Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 73 (D.C. Cir. 2016) (deeming rational a grant program for socially disadvantaged businesses). Lawmakers often have to draw lines when "classifying governmental beneficiaries," and sometimes that means those with "strong claim[s] to favored treatment" will be left out. *Beach Commc'ns*, 508 U.S. at 315–16; *see also, e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108 (2003); *Regan*, 461 U.S. at 550–51; *Maher*, 432 U.S. at 477; *City of New Orleans v. Dukes*, 427 U.S. 297, 303–06 (1976) (per curiam); *Dandridge v. Williams*, 397 U.S. 471, 486 (1970) (per curiam).

That is what happened here. MPS has legitimate interests in reducing overcrowding and expanding educational access in MPS schools. With those goals in mind, MPS eased transportation to and from the schools that can help it do both. Easing transportation for private-school (and attendance-area) students, on the other hand, would do little to further MPS's goals. And that distinction gives MPS reason enough to treat the schools differently under rational-basis review. *See, e.g.*, *Idaho Dep't of Employment v. Smith*, 434 U.S. 100, 101 (1977) (per curiam).

St. Joan attacks the rationality of MPS's application of the one-mile rule on other grounds. It asserts that overcrowding is not truly a problem in MPS schools, because many attendance-area schools are not at maximum capacity. St. Joan argues further that MPS has no reason to differentiate St. Joan from citywide schools because St. Joan also offers special programming. These arguments may have held water if St. Joan had a strict-scrutiny case. But it does not. On rational-basis review, classifications can be both underinclusive and overinclusive and still survive. *E.g.*, *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 655–56 (7th Cir. 2013). MPS, moreover, does not need conclusive support from "evidence or empirical data" to make the rational decisions it has. *Beach Commc'ns*, 508 U.S. at 313–15.

Turning to MPS's second justification, cost savings may serve as a rational basis for classifications. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83–84 (1988); *Bowen*, 483 U.S. at 599; *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 948 (7th Cir. 2009); *Irizarry v. Bd. of Educ. of City of Chicago*, 251 F.3d 604, 610 (7th Cir. 2001). The cases that so hold generally identify potential costs that are unique or distinct to the disfavored group. *See Bankers Life*, 486 U.S. at 83–84 (charging assessments on non-monetary judgments "would impose a considerable cost in judicial resources"); *Irizarry*, 251 F.3d at 610 (excluding unmarried persons from dependent benefits resulted in "distinct" savings). In another busing case, for example, we concluded that a school district had a rational basis for not transporting a charter school's students, because doing so would have resulted in "unique and additional costs" to the school district. *Racine Charter One*, 424 F.3d at 685–87. That is not to say that states can randomly discriminate to keep costs down. If the state's cutoff is arbitrary or invidious, then the classification

is by definition not rational. *See Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).

Cost savings, in the context of MPS's other goals, provide an additional rational basis here. It may well be true, as St. Joan asserts, that a St. Joan student is no more expensive to bus than a citywide or nonattendance-area student. But MPS is already stretched thin; it spent forty-million dollars to provide busing in the 2016–2017 school year, barely any of which state aid covered. Despite those straits, MPS could believe that overcrowding and access concerns were worth taking on the added cost of busing most citywide and nonattendance-area students. It has no similar reason to take on those costs for private and attendance-area students. So MPS made the rational choice: pay more to expand busing to schools that could reduce overcrowding and promote program access, but not to schools that are less likely provide the same returns. *See Bowen*, 483 U.S. at 596; *Idaho Dep't of Employment*, 434 U.S. at 101.

The one-mile rule therefore has rational bases. But how does § 121.54's reasonable uniformity requirement factor in? Courts typically ask whether a rational basis is conceivable, without paying mind to what the state actually said or thought. *Monarch Beverage*, 861 F.3d at 685. St. Joan, however, argues that this case is different, because § 121.54 precludes MPS from relying on the rational bases that it has.

St. Joan's argument derives from *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va.*, 488 U.S. 336 (1989). In *Allegheny*, the Supreme Court considered a county's property-tax assessment scheme that "systematically produced

dramatic differences in valuation"—in some cases assessing property at more than thirty times the rate of comparable properties. *Allegheny*, 488 U.S. at 341. The county defended the scheme by arguing that it aimed to peg "properties at true current value." But that goal, the Court held, could not rationally explain the gross disparities in tax treatment. *Id.* at 343–44. Nor could state law. The Court recognized that states can make rational distinctions among taxpayers and assess different tax burdens, but the state had "not drawn such a distinction." *Id.* at 345. To the contrary, West Virginia's constitution mandated that "taxation *shall be equal and uniform* throughout the State." *Id.* at 338 (emphasis added). The Court therefore saw no conceivable rational bases for the scheme. *Id.* at 345–46.

*Allegheny*'s holding is quite narrow. Three years after *Allegheny* came *Nordlinger v. Hahn*, another equal-protection challenge involving property taxes. 505 U.S. 1 (1992). Like the scheme in *Allegheny*, the law in *Nordlinger* "resulted in dramatic disparities in taxation." *Id.* at 14. But *Allegheny* was distinguishable, according to the Court. Citing the *Allegheny* county's irrational justification and the state-law uniformity directive, the Court concluded that *Allegheny* "was the rare case where the facts precluded any plausible inference" of a rational basis. *Id.* at 14–16; *see also Fitzgerald*, 539 U.S. at 109–10; Chemerinsky, CONSTITUTIONAL LAW 718 (after *Nordlinger*, *Allegheny* "seems limited to challenges of arbitrary and unjustifiable administrative decisions"). Two decades after *Nordlinger*, the Court again emphasized *Allegheny*'s limits in *Armour*.

In *Armour*, the Supreme Court evaluated how Indianapolis divvied up the costs of a new sewer project among local

homeowners. Indiana law required that such costs be "apportioned equally." Ind. Code § 36-9-39-15(b)(3) (2011). Indianapolis did so, at least at first, by assessing each homeowner the same rate. After the assessment, some paid in lump sums and others began paying in installments. The city soon reversed course, though, and opted to use bonds to pay for the project. It then forgave any outstanding installments owed, but it refused to pay back homeowners who had paid in a lump sum. *Armour*, 566 U.S. at 678–79. The result: homeowners who paid upfront spent as much as thirty times more than other homeowners. *See id.* at 679.

Despite the parallels—a state uniformity law and gross disparity—the Court in *Armour* held that *Allegheny* did not control. *Id.* at 687. *Allegheny*, the Court explained, "involved a *clear* state law requirement *clearly and dramatically* violated." *Id.* (emphases added). Not so in *Armour*, according to the Court, because the city followed state law in the first instance, and state law said nothing about forgiveness plans. The Court went no further on the state-law question, rejecting the view that "ordinary violations of ordinary state tax law" can amount to "violations of the Federal Constitution." *Id.* at 687–88. The Court repeated that *Allegheny* was the "'the rare case where the facts precluded' any alternative reading of state law and thus any alternative rational basis." *Id.* at 687 (quoting *Nordlinger*, 505 U.S. at 16).

This is not one of those rare cases. MPS's avowed rational bases are sound, and § 121.54 does not render them implausible. For one, § 121.54's reasonable uniformity requirement is not "clear." *See Armour*, 566 U.S. at 687. It is the opposite—"ambiguous"—as *St. John Vianney Sch. v. Bd. of Educ. of Sch. Dist. of Janesville* held. 336 N.W.2d 387, 393 (Wis. Ct. App.

1983). There is also little caselaw explaining the requirement. *St. John Vianney*, for its part, noted that the requirement prevents discrimination based on how far students live from school. *Id.* at 393–94; *see also* Wis. Stat. § 121.54(2)(c), (4) (discussing reasonable uniformity in terms of the distances transported to and from school). That, however, does not move much here, because the one-mile rule does not discriminate on a distance-from-school basis. What is more, absent "clear" law, we do not see what MPS "clearly and dramatically" violated. *See Armour*, 566 U.S. at 687. It is true that the one-mile rule effectively denies busing to most of the St. Joan students who applied for it. But we decline to speak for the Wisconsin courts as to whether that result is "reasonable" as a matter of local busing policy. MPS is financially strained as it is, and the rule does apply uniformly to private and attendance-area students.[4]

Of course, none of this means that the one-mile rule complies with § 121.54. That question is not before us, and the answer, unsettled as it is, should come from the Wisconsin courts. To resolve the equal-protection claim before us, we hold only that MPS has offered rational bases that are plausible notwithstanding state law.

In coming out the other way, the dissent goes further than we are willing. It draws on legislative history and potentially

---

[4] We said earlier that we do not need to determine, for equal-protection purposes, what types of schools St. Joan is most like (citywide or nonattendance area, who generally get busing, or attendance-area schools, who generally do not). At the same time, we have no basis to say what practical and regulatory distinctions will matter to the Wisconsin courts for § 121.54 purposes.

comparable lower-court decisions (like *St. John Vianney*) to conclude that the one-mile rule violates § 121.54 clearly enough to implicate *Allegheny* and negate MPS's rational bases. With respect, we think that approach does more than what *Allegheny* and *Armour* did. For even if the one-mile rule violates § 121.54,[5] a mere violation of state law does not bootstrap itself into a violation of the Equal Protection Clause. *Armour*, 566 U.S. at 687–88; *see also* William C. Cohen, *State Law in Equality Clothing: A Comment on Allegheny Pittsburgh Coal Company v. County Commission*, 38 UCLA L. Rev. 87, 99–103 (1990).

## C. The July 1 Deadline

MPS additionally requires private schools to provide by July 1 the names of students who need busing. This deadline applies only to private-school students, not MPS students, and thus St. Joan claims that it also violates equal protection. In response, MPS proffers one rational basis in support of the deadline: administrative necessity.

There is no question that administrative concerns can justify certain classifications. *E.g.*, *Armour*, 566 U.S. at 683; *Bankers Life*, 486 U.S. at 84; *Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 775 (7th Cir. 1999). Such concerns exist here.

---

[5] It is worth adding that in *Allegheny*, unlike here, the state courts at least had an opportunity to decide whether the challenged scheme violated state law. West Virginia's highest court assumed that it did, but the court refused to order relief because it concluded that absent "intentional and systemic" undervaluation the petitioners had to seek relief from the assessor. *Allegheny*, 488 U.S. at 342–43 (citing *In re 1975 Tax Assessments Against Oneida Coal Co.*, 360 S.E.2d 560, 565 (W.Va. 1987)); *see also* John Hart Ely, *Another Spin on Allegheny Pittsburgh*, 38 UCLA L. Rev. 107, 109 (1990) (explaining the "strange" circumstances of *Allegheny*).

Before school starts, MPS must determine which students are eligible for transportation, compare school rosters to confirm that students are not double booked, and arrange for bus services or contract for alternative transportation services. *See* Wis. Stat. § 121.55. These tasks all require MPS to have the students' information well in advance of the school year. While MPS has direct access to its own students' information, it does not have the same for private-school students. As a result, some deadline by which private schools must provide student information is logistically rational—and statutorily mandated by Wis. Stat. § 121.54(2)(b). Whether July 1, as opposed to, say, September 1, is the wisest or fairest choice is not for us to decide. *See, e.g., Heller*, 509 U.S. at 319–320; *Nordlinger*, 505 U.S. at 18; *Hodel v. Indiana*, 452 U.S. 314, 331 (1981).

That is sufficient to deem the deadline constitutional on its face.[6] *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 941–46 (7th Cir. 2016); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987). St. Joan, however, also lobs a related challenge to what comes after the deadline. According to St. Joan, MPS treats students who enroll near or after July 1 differently depending on their school. To illustrate, St. Joan offers a hypothetical. Suppose MPS completes transportation arrangements for all schools (public and private) by August 15. A week later, two families, each with a fourteen-year-old, move to Milwaukee. One family decides to send its child to a private

---

[6] We use the term "on its face" advisedly, although we note that the July 1 deadline has not been recorded anywhere (at least as far as this record is concerned). That is odd, particularly because the July 1 deadline conflicts with the September deadline set forth in Policy 4.04 and the May 15 deadline in Wis. Stat. § 121.54(2)(b). St. Joan, however, has not argued that these facts impact the constitutional analysis, and so we do not address them.

school outside of her neighborhood; the other opts for a pub-
lic school outside of her neighborhood. And then MPS learns
of the two students, and their need for busing, on the exact
same day. The private-school student cannot get busing; yet
the public-school student could, according to St. Joan.

That prospect gives us pause. The time needed to arrange
for transportation before the school year justifies imposing a
roster-notification deadline on private schools. But *pre*-ar-
rangement needs offer no justification for treating *post*-ar-
rangement latecomers differently. Granted, some rigidity in
the deadline may be rational (to motivate private schools to
comply with the it); but even that would not justify treating
students who move to the district near or after the deadline
differently, based only on whether they go to private or public
school. We see no rational basis for that distinction, and MPS
has not provided any. Perhaps there are heightened burdens
associated with latecomer private-school students that do not
exist for public-school students, but again, MPS has not
pointed to any.

That said, we cannot order relief on this record. Unlike the
dissent, at least two things remain unclear to us. First, we do
not know whether, in fact, MPS enforces the July 1 deadline
in the manner just described. At oral argument, counsel for
MPS hedged when asked directly; and the parties have not
directed us to a part of the record that reveals a clear answer.
Second, we do not know *why* St. Joan updated its roster after
the July 1 deadline—whether the result of latecomers, pro-
crastination, or something else. These facts matter, of course,
because an as-applied challenge concerns only the present
case, not hypotheticals. *See, e.g., Hegwood v. City of Eau Claire*,
676 F.3d 600, 603 (7th Cir. 2012); *United States v. Skoien*, 614

F.3d 638, 645 (7th Cir. 2010) (en banc). We therefore conclude that further fact-finding is necessary. *See, e.g., Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir. 1996). After that occurs, it is up to the district court in the first instance to decide what relief, if any, is appropriate.

### III. Conclusion

For these reasons, we AFFIRM the district court's judgment with respect to the one-mile rule and we REVERSE and REMAND for further proceedings consistent with this opinion with respect to the July 1 deadline.

SYKES, *Circuit Judge*, dissenting. I respectfully dissent. Unlike my colleagues, I think this is indeed the "rare case" in which a state-law uniformity mandate removes otherwise plausible policy justifications for a local legislative classification, leaving no rational basis for the local rule. *Nordlinger v. Hahn*, 505 U.S. 1, 16 (1992) (describing *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va.*, 488 U.S. 336 (1989)). I would reverse and remand for entry of judgment for the plaintiff.

\* \* \*

To understand this unusual equal-protection claim, it's helpful to review the relevant state legal history. In 1962 the Wisconsin Supreme Court held that the state constitution prohibited the expenditure of public funds to transport children to parochial and private schools. *State ex rel. Reynolds v. Nusbaum*, 115 N.W.2d 761, 769–70 (Wis. 1962). Wisconsin voters responded by amending the constitution. In 1967 they added this language: "**Transportation of school children**. Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning." WIS. CONST. art. I, § 23.

Acting on this new constitutional authority, the Wisconsin legislature immediately "elect[ed] to provide for the transportation of children to any parochial or private school by amending the existing statutes … to provide for transportation for students attending private or parochial schools and public schools *upon a reasonably uniform basis*." *Cartwright v. Sharpe*, 162 N.W.2d 5, 8 (Wis. 1968) (emphasis added). The enabling legislation included an explicit state-

ment of statutory purpose: "The intent of this act is to pro-
vide for the safety and welfare of children by providing for
their transportation to and from public and private schools."
Ch. 68, § 1, 1967 Wis. Sess. Laws 144.

To that end, the legislature amended the school-
transportation statutes to require "every school board" to
provide transportation to and from public *and* private
schools for all students who reside in the district and live
"2 miles or more" from their school. WIS. STAT. § 121.54(2)(a),
(b) (mandating public and private school transportation on
these terms). So school districts have a statutory duty to
provide free transportation to and from school for all resi-
dent children who live two miles or more from their school,
whether public *or* private.

School districts may of course provide more generous
transportation service. The statutory scheme recognizes that
school boards may elect to transport "all or some of the
pupils" who reside in the district and live *less than* two miles
from their school. *Id.* § 121.54(2)(c). If they choose to do so,
however, they may not use different distance standards for
public and private school students: "If transportation is
provided for less than all such pupils[,] there shall be rea-
sonable uniformity in the minimum distance that pupils
attending public and private schools will be transported." *Id.*
The uniformity requirement is repeated in the subsection
governing transportation to summer classes. School districts
are permitted (but not required) to bus children to summer
school, but "[i]f the school board provides transportation for
less than all pupils, there shall be reasonable uniformity in
the minimum and maximum distances pupils are transport-
ed." *Id.* § 121.54(4).

Finally, and most relevant here, the transportation mandate excludes children who live in cities served by public transit systems. *Id.* § 121.54(1)(c). Under the so-called "city option," school districts in cities with public transit service are not required to provide free student transportation. If they choose to do so, however, "there shall be reasonable uniformity in the transportation furnished to the pupils, whether they attend public or private schools." *Id.* § 121.54(1)(b). In this way the "city option," like the other transportation provisions, requires equal treatment of public and private school students.

The 1967 legislation soon spawned litigation. In a key early case interpreting the new statutory scheme, the Wisconsin Supreme Court explained that "[t]he important change" ushered in by the constitutional amendment and enabling legislation "was to provide that where transportation is furnished, either mandatory or permissive, it must be on a reasonably uniform basis to children attending either public or private schools." *Cartwright*, 162 N.W.2d at 10–11. Put slightly differently, "[w]hat the constitutional amendment and enabling legislation accomplished was to provide that the same consideration of safety and welfare should apply to public and private students alike." *Id.* at 11.

\* \* \*

The Milwaukee Public School District ("MPS" or "the District") qualifies for the city option. The District serves children in the City of Milwaukee, where public bus service (operated by the Milwaukee County Transit System) is available. MPS has chosen to provide free transportation service to some resident children and thus is bound by the

statutory obligation to treat public and private school students alike.

MPS Administrative Policy 4.04 contains the District's transportation regulations. Two features of the policy are at issue here. The first concerns the distance standards for determining eligibility for free transportation. The policy draws no distinction between public and private elementary-school students. Tracking the statutory mandate for noncity schools, MPS provides free transportation for public and private school students in grades K–8 who live "two miles or more" from their school. ADMINISTRATIVE POLICIES OF THE MILWAUKEE PUBLIC SCHOOLS, POLICY 4.04(2)(a)1., (b)1. (Nov. 12, 2014).

The eligibility rules are different for students in grades 9–12. MPS conditions free transportation service for high-school students on the two-mile rule *plus* an additional distance requirement. The District will transport only those high-school students who live "two miles or more" from their school *and* "more than one mile walking distance from public transportation." *Id.* 4.04(2)(a)3., (b)2. So families of high-school students who live within one mile of a public transit stop must pay their own transportation costs.

But MPS lifts this second condition for students who attend citywide public high schools or public high schools outside their neighborhood attendance area. *Id.* 4.04(5)(a)2., (b)2. In other words, students who attend *public* citywide high schools and live two miles or more from school get free transportation from the District *regardless* of their proximity to public transportation; their counterparts in *private* citywide high schools do not. The latter are ineligible for free

transportation unless they live more than one mile from a public transit stop.

Students at private schools are disadvantaged in another way. Milwaukee children who attend private schools (regardless of grade level) cannot receive transportation from MPS unless the private school "submits the names, grade levels, and location of eligible students no later than the third Friday of September." *Id.* 4.04(2)(b)4. As my colleagues explain, in practice MPS requires private schools to submit their transportation rosters by July 1. Students who enroll after that date—whether later in the summer or after the school year has begun—are ineligible to receive transportation service from MPS for that school year. The roster requirement and July 1 cutoff date apply only to private schools. Late and mid-year enrollees in the District's own schools are not denied free transportation.

\* \* \*

St. Joan Antida High School challenges these disparate transportation rules on behalf of itself and its students. St. Joan Antida is a private, all-girls high school in the City of Milwaukee with a citywide attendance area. That is, its students come from all over Milwaukee, not just the immediate neighborhood, so they are similarly situated in all material respects to students in public citywide high schools. Yet MPS treats them unequally for purposes of transportation eligibility. They are denied free transportation if they live within one mile of a public transportation stop. MPS does not apply this extra distance requirement to their counterparts at public citywide high schools. This difference in treatment, the school argues, violates the Fourteenth Amendment's Equal Protection Clause. St. Joan Antida also

challenges the July 1 roster deadline, which operates as a cutoff date to receive transportation service but applies only to students in private schools.

My colleagues conclude that the challenged rules do not burden a fundamental right and thus do not trigger strict scrutiny under prevailing equal-protection doctrine. I agree and have nothing to add to the analysis in Section IIA of the majority opinion. The challenged rules need only be rationally related to a legitimate governmental interest. This is a highly deferential standard. As the majority explains, under rational-basis review, (1) the challenged law enjoys a presumption of validity; (2) the government's actual reasons for adopting it do not matter; and (3) the fit between the government's means and its ends can be both hypothetical and very loose. In short, as long as some legitimate governmental purpose is conceivably in play and the law might rationally be thought to serve that purpose, the test is satisfied. It's almost impossible to flunk this lenient standard.

Even so, there is a legal baseline below which local laws may not fall and still be thought minimally rational for equal-protection purposes. If state law places persons in the same class and directs local governments to treat everyone in the class uniformly, local governments cannot discriminate on the very terms forbidden by state law and expect to survive rational-basis review. The Supreme Court explained and applied this principle in *Allegheny*. There the Court reviewed a tax-assessment method used by a West Virginia county that assessed property based on its purchase price when last sold and adjusted stale data on an ad hoc and sporadic basis to account for the passage of time. *Allegheny*, 488 U.S. at 338. In practice this assessment method produced

"gross disparities in the assessed value of generally compa-
rable property." *Id.* State law, however, mandated that
"taxation shall be equal and uniform throughout the State,
and all property, both real and personal, shall be taxed in
proportion to its value." *Id.* (quoting W. VA. CONST. art. X,
§ 1). Affected property owners sued, claiming that the
county's assessment method violated their rights under the
Equal Protection Clause.

The county maintained that its assessment method was a
rational way to measure "true current value" because it used
actual sale prices plus periodic adjustments "[a]s those data
grow stale." *Id.* at 343. The Court disagreed, though it did
"not intend to cast doubt upon the theoretical basis of such a
scheme." *Id.* "That two methods are used to assess property
in the same class is, without more, of no constitutional
moment. The Equal Protection Clause 'applies only to
taxation which in fact bears unequally on persons or proper-
ty of the same class.'" *Id.* (quoting *Charleston Fed. Savings &
Loan Ass'n v. Alderson*, 324 U.S. 182, 190 (1945) (collecting
cases)). The factual predicate was easily established in
*Allegheny*: "Petitioners' property has been assessed at rough-
ly 8 to 35 times more than comparable neighborhood proper-
ty, and these discrepancies have continued for more than
10 years with little change." *Id.* at 344.

The Court continued: "The States, of course, have broad
powers to impose and collect taxes … [and] may divide
different kinds of property into classes and assign to each
class a different tax burden so long as those divisions and
burdens are reasonable." *Id.* "But West Virginia has not
drawn such a distinction. Its Constitution and laws provide
that all property of the kind held by petitioners shall be

taxed at a rate uniform throughout the State according to its estimated market value." *Id.* at 345. State law required reasonable uniformity, but the county's assessment scheme "systematically produced dramatic differences in valuation" for similarly situated properties. *Id.* at 341. Because the valuation method consistently produced results that transgressed the state-law uniformity norm, it was not rationally related to a legitimate governmental purpose. *Id.* at 343–45. That is, state law negated any conceivable rational basis for the local discriminatory practice. The Court found an equal-protection violation. *Id*. at 346.

As my colleagues observe, the Court later described *Allegheny* as "'the rare case where the facts precluded' any alternative reading of state law and thus any alternative rational basis" for the challenged local practice or rule. *Armour v. City of Indianapolis*, 566 U.S. 673, 687 (2012) (quoting *Nordlinger*, 505 U.S. at 16). In *Armour* homeowners sued the City of Indianapolis after it changed its method of funding sewer projects. Indiana law required that "costs [for sewer improvements] be primarily apportioned equally among all abutting lands or lots." IND. CODE § 36-9-39-15(b)(3) (2011). Indianapolis did just that, though it gave homeowners the option to pay the special assessment all at once or in installments. *Armour*, 566 U.S. at 676–77. The City later abandoned that method in favor of a system that primarily relied on citywide bonds, spreading the cost across the entire municipal tax base. With this shift in policy, the City forgave any unpaid installments but did not refund homeowners who had already finished paying. *Id*. at 678–79.

The Court held that the case did not implicate *Allegheny*. The statute required Indianapolis to apportion costs

equally—which the City plainly had done—but state law said nothing about later forgiveness. The Court explained: "[T]he City followed state law by apportioning the cost of its [sewer] projects equally. State law says nothing about forgiveness, how to design a forgiveness program, or whether or when rational distinctions in doing so are permitted." *Id*. at 687. That distinguished *Armour* from *Allegheny*. The Court characterized *Allegheny* as a "rare case" because it "involved a clear state law requirement clearly and dramatically violated." *Id.*

Unlike my colleagues, I do not read this last sentence as materially changing *Allegheny*'s fundamental holding. True, the Court in *Allegheny* said that the county's assessment method produced "dramatic differences in valuation," but that statement was descriptive, not doctrinal. If *Armour* truly limits *Allegheny* to local rules or practices that "dramatically" depart from state law, we'd need some standard to distinguish "dramatic" departures from those that are not. But *Armour* did not elaborate. On this point at least, I hesitate to read this passage from *Armour* as a doctrinal limitation on *Allegheny*.

Perhaps it's fair to read *Armour* as limiting *Allegheny*'s holding to clear violations of clear state uniformity mandates. If so, we have that here. As I've explained, the school-transportation statutes say—again and again—that school districts must treat public and private school students reasonably equally when it comes to access to publicly funded transportation. Districts operating under the city option need not provide free school transportation to any resident children, but if they provide it to *some*, then the law requires "reasonable uniformity in the transportation fur-

nished to the pupils, whether they attend public or private schools." § 121.54(1)(b).

Put another way, if the city option were not in play, MPS would have a plain statutory duty to transport all students who live two miles or more from their school, whether public or private. § 121.54(2). But because public transit is readily available in Milwaukee, MPS may (1) provide no busing at all or (2) provide busing on equal terms to public and private school students. § 121.54(1)(b). MPS has chosen a third way. It provides transportation for students in *public* citywide high schools who satisfy the two-mile rule but not their counterparts in *private* citywide high schools. It has invoked the city option on discriminatory terms expressly forbidden by the statute. That's an irrational policy choice as a matter of law.

It's true, as my colleagues point out, that § 121.54(1)(b) has not been the subject of much appellate litigation in the state courts. The Wisconsin Supreme Court has not had occasion to address its scope. In one case the state court of appeals concluded that the term "reasonable uniformity" in § 121.54(1)(b) is ambiguous. *St. John Vianney Sch. v. Bd. of Educ. of Sch. Dist. of Janesville*, 336 N.W.2d 387, 393 (Wis. Ct. App. 1983). The precise question in *St. John Vianney* was whether the uniformity mandate in § 121.54(1)(b) requires school districts to provide the same *mode* of transportation to public and private school students. More particularly, the plaintiffs argued that if the district provided so-called "yellow school bus" service for students in public schools, then it had to provide "yellow school bus" service for students in private schools. *Id.* at 388–89. The court rejected that argument. Reading § 121.54(1)(b) in the context of the statutory

scheme as a whole, the court noted that the school-transportation code gives school boards the discretion to use any of five different modes of transportation to comply with their statutory obligations. *See* WIS. STAT. § 121.55. The court said: "It would be unreasonable to conclude that the 'reasonable uniformity' requirement of sec. 121.54(1) abrogates the board's option to provide transportation by any of the methods expressly permitted under sec. 121.55." *St. John Vianney*, 336 N.W.2d at 393.

That was enough to decide the case, but the opinion continues with some extensive dicta. The court went on to observe that "[t]he overall concern behind the school transportation statutes is the safety and welfare of pupils." *Id.* Recognizing that "many factors affect … safety and welfare," the court deduced from the broader statutory scheme that "[t]he distance a child lives from school is … the principal factor with which the statutes are concerned." *Id.* Acknowledging that § 121.54(1)(b) "is silent regarding a distance standard in connection with the reasonable uniformity requirement," the court read the statute to "prevent[] a school board from distinguishing for transportation purposes between public and private school pupils on the basis of the distance they live from school." *Id.* at 394. On this understanding, the court said that "whatever … distance standard the board chooses, the distance standard must be reasonably uniform in its application to public and private school pupils." *Id.*

The actual holding in *St. John Vianney* is limited. The court held only that the uniformity mandate in § 121.54(1)(b) does not require school districts to use identical modes of transportation for public and private school students. The

court's extended discussion goes further, suggesting that whatever else the term "reasonable uniformity" may entail, at a minimum it prevents school districts from using different distance-from-school standards for public and private school students to determine their eligibility for free transportation. MPS's one-mile rule is a materially similar distance standard; high-school students who live within one mile of a public transit stop are ineligible for free transportation to school. But the rule is discriminatory on its face: it applies only to students at *private* citywide high schools; students at *public* citywide high schools get free transportation regardless of their proximity to public transit. On the reasoning of *St. John Vianney*, the statutory uniformity mandate forbids *precisely* this kind of discrimination by local school districts in the provision of free school transportation.

A case decided four years before *St. John Vianney* sheds even more light on the scope and operation of the uniformity requirement. In *Hahner v. Board of Education*, a school district provided busing on *almost* uniform terms to public and private schools. The problem was that it routinely refused to bus students to certain Catholic schools that held classes during a week when other schools in the district (public and private) had spring break. 278 N.W.2d 474, 475–76 (Wis. Ct. App. 1979). As a result, a small number of students attending Catholic schools did not receive busing for the entirety of their school year.

Addressing the "reasonable uniformity doctrine" in the school-transportation code,[1] the court held that the district

---

[1] *Hahner* does not specifically mention § 121.54(1)(b), but it relies on authorities that do. *Hahner v. Bd. of Educ.*, 278 N.W.2d 474, 478–80 (Wis.

did not have the discretion to deny transportation to Catholic school students when their schools were in session but the public schools were not. *Id.* at 478, 479–80. The opinion is significant for what it tells us about the dimensions of the reasonable-uniformity requirement: even a one-week denial of transportation to private school students is impermissible, as are deviations from the uniformity norm unrelated to student safety and welfare. Here is the key passage:

> The crucial question is whether a school board's discretion in coordinating the scheduling of the transportation of pupils to public and private schools extends to not transporting pupils to private schools during a week when the public schools are closed for vacation. … [T]he purpose of coordinating these transportation activities is "to insure the safety and welfare of the pupils" as provided in sec. 121.56, Stats. This court believes the objective of this requirement is to prevent discriminatory treatment of pupils attending private schools in the transportation provided them. *The fact that the school district would save money by not transporting private school pupils during a week when the public schools are closed for vacation is a factor which bears no relationship to the safety and welfare of the pupils being transported to public schools.*

*Id.* at 479 (emphasis added).

---

Ct. App. 1979) (citing *Cartwright v. Sharpe*, 162 N.W.2d 5, 10–11 (Wis. 1968), and 61 Wis. Op. Att'y Gen. 240, 241 (1972)).

Together, *St. John Vianney* and *Hahner* make clear that MPS's discriminatory one-mile rule violates the statutory requirement of reasonable uniformity in the provision of free transportation to public and private school students. The challenged rule is unequal on its face and cannot be justified by reference to student safety and welfare, which are the only legitimate public-policy interests recognized by state law as justifications for school-transportation distinctions between public and private school students. Simply put, state law forbids MPS from making a policy choice to allocate free transportation on these unequal terms.

MPS defends its discriminatory one-mile rule based on abstract goals of avoiding overcapacity in its neighborhood schools, expanding access to special programming, and saving money. My colleagues accept these justifications as rational reasons for discriminating against private school students. With respect, state law leaves no room for these possible policy justifications. The state legislature has decreed a public policy of reasonably uniform treatment of public and private school students when it comes to free school transportation. School districts may not have different eligibility rules for public and private school students (except perhaps for safety and welfare reasons). Under clear state law, discriminating between public and private school students is not an available means to achieve other policy goals. Put somewhat differently, a local rule that defies the state-law uniformity command serves no *legitimate* governmental purpose. Like the county tax-assessment method in

*Allegheny*, the MPS rule violates the Equal Protection Clause.[2]

In reaching this conclusion, I do not purport to "speak for the Wisconsin courts" any more than the Supreme Court purported to "speak for the West Virginia courts" when it found an equal-protection violation in *Allegheny*. Majority Op. at p. 18. My conclusion simply recognizes that the statutory uniformity mandate removes the plausible policy justifications for this discriminatory local rule, which classifies students on the *precise* terms forbidden by statute.[3]

---

[2] In *Racine Charter One, Inc. v. Racine Unified School District*, we accepted a school district's "cost" justification as a rational basis for not busing students to a charter school. 424 F.3d 677, 685–87 (7th Cir. 2005). I question that holding, which flatly contradicts *Hahner*. *Racine Charter One* held in the alternative that the charter school's students were not similarly situated "to those students who do receive the busing benefit." *Id.* at 683. I question that holding as well, but the case is perhaps distinguishable from ours on that ground.

[3] My colleagues say that I've gone too far because my analysis "draws on legislative history and potentially comparable lower-court decisions (like *St. John Vianney*)." Majority Op. at p. 18–19. That misunderstands Wisconsin's approach to statutory interpretation and the constitutional status of the state court of appeals.

Wisconsin has adopted a textualist method of statutory interpretation that limits the use of legislative history. *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 681 N.W.2d 110, 124–26 (Wis. 2004). But *statutory* history is not the same as *legislative* history. *Statutory History*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The enacted lineage of a statute, including prior laws, amendments, codifications, and repeals."); *Legislative History, id.* ("The proceedings leading to the enactment of a statute, including hearings, committee reports, and floor debates."). Statutory history provides context for statutory terms and is an accepted part of Wisconsin's textualist interpretive method. *See County of Dane v. Labor &*

For similar reasons, the District's enforcement of the July 1 roster deadline violates the Equal Protection Clause. As I understand this claim, St. Joan Antida does not object to a general rule requiring private schools to submit a transportation roster by a date certain. It challenges the District's practice of denying free transportation to students who enroll after the deadline passes. Late and mid-year enrollees at public schools do not suffer the same fate. This policy, too, violates the state-law requirement of reasonable uniformity, leaving no rational basis for the discriminatory treatment.

My understanding of this claim differs from the majority's in another way. St. Joan Antida challenges the enforcement of the roster policy as a general matter. The school seeks an injunction against the discriminatory denial of transportation to students who enroll in private school after

---

*Indus. Review Comm'n*, 759 N.W.2d 571, 580 (Wis. 2009); *Kalal*, 681 N.W.2d at 126. The same is true of statements of purpose contained in the statutory text. *Kalal*, 681 N.W.2d at 125. Finally, Wisconsin's approach to statutory interpretation reads statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id*. at 124. Everything I've said here is consistent with Wisconsin law.

Further, the state court of appeals, though divided into four districts, is a unitary court, and its published opinions are binding statewide precedent until "overrule[d], modif[ied,] or withdraw[n]" by the state supreme court. *Cook v. Cook*, 560 N.W.2d 246, 256 (Wis. 1997). My analysis draws on a seminal decision of the state supreme court (*Cartwright*) and two decisions of the court of appeals (*St. John Vianney* and *Hahner*). All three have binding statewide precedential effect.

the July 1 deadline. St. Joan Antida also seeks damages; the monetary remedy is of course keyed to facts peculiar to the school and its students. But the parties have stipulated to damages.

My colleagues share some of my concerns about the rationality of this policy and remand for further clarification and development of this claim. As I see it, all that remains to be done on remand is to fashion an appropriate injunctive remedy and enter judgment granting injunctive and monetary relief. St. Joan Antida has explained that students who have not yet enrolled in private school by the July 1 deadline (and thus do not appear on a private school's roster) are denied free transportation for the ensuing school year. Late and mid-year enrollees in the public schools are not. MPS has not denied that it enforces its July 1 roster policy in this way. In light of the statutory uniformity mandate, this discriminatory treatment cannot be justified as rationally related to a legitimate governmental interest.

For these reasons, I would reverse and remand with instructions to enter judgment for St. Joan Antida.